WK:DG
F. #2017R00930

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 6 - 2017 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

RAMIRO ANDRES LUQUE FLORES,
    also known as "Ramiro Luque,"

        Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

I N F O R M A T I O N

Cr. No._____
(T. 18, U.S.C., §§ 371, 981(a)(1)(C),
 982(a)(1), 982(b)(1) and 3551 et seq.;
 T. 21, U.S.C., § 853(p); T. 28, U.S.C.,
 § 2461(c))

THE UNITED STATES CHARGES:

At all times relevant to this Information, unless otherwise stated:

THE DEFENDANT AND REFERENCED INDIVIDUALS AND ENTITIES

1.   The defendant RAMIRO ANDRES LUQUE FLORES, also known as "Ramiro Luque," (hereinafter "RAMIRO LUQUE" or "LUQUE"), was an Argentinian national who previously lived in Ecuador and now resides in the United States.

2.   Co-Conspirator 1 ("CC-1"), an individual whose identity is known to the United States, was a dual United States and Ecuadorian citizen who resided in the United States. CC-1 was a registered United States investment adviser and a minority owner and financial adviser for a financial services company that serviced customers primarily in Latin America. CC-1 was a "domestic concern" as that term is defined in the Foreign Corrupt Practices Act ("FCPA"), Title 15, United States Code, Section 78dd-2(h)(1).

3.   "Escrow Agent Company," an entity the identity of which is known to the United States, was an escrow agent formed and registered in the British Virgin Islands. Escrow

Agent Company held a bank account in the Cayman Islands (the "Cayman Islands Account"). CC-1 had the authority to accept payments into the Cayman Islands Account and to direct payments out of that account.

4. Empresa Pública de Hidrocarburos del Ecuador ("PetroEcuador"), headquartered in Quito, Ecuador, was the state-owned oil company of the Republic of Ecuador. PetroEcuador was controlled by the government of Ecuador and performed a function that Ecuador treated as its own, and thus was an "instrumentality" of the Ecuadorian government, as that term is used in the FCPA.

5. "Oil Services Company," an entity the identity of which is known to the United States, was an Ecuadorian company that specialized in the disposal of hazardous waste from oil and gas production. The defendant RAMIRO LUQUE created Oil Services Company in or about May 2012. LUQUE owned fifty percent of Oil Services Company starting in or about the end of 2013. However, LUQUE controlled Oil Services Company from its inception to the present. In or about and between December 2012 and late 2016, Oil Services Company obtained approximately five contracts and other supplemental contracts with PetroEcuador for the provision of hazardous waste disposal services in exchange for approximately $38 million.

6. "Shell Company 1," an entity the identity of which is known to the United States, was a Panamanian entity beneficially owned and controlled by the defendant RAMIRO LUQUE. In or about October 2012, CC-1 assisted LUQUE in acquiring Shell Company 1 from a Panamanian law firm. In or about February 2013, LUQUE opened an investment account in the United States in the name of Shell Company 1. LUQUE also held a bank account in the name of Shell Company 1 at Capital Bank in Panama. CC-1 assisted LUQUE in opening these bank accounts.

7. "PetroEcuador Official 1," an individual whose identity is known to the United States, was an Ecuadorian citizen who served as the Administrator of the Rehabilitation Program of PetroEcuador's Esmeraldas Refinery. PetroEcuador Official 1 was a foreign official as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

8. "Shell Company 2," an entity the identity of which is known to the United States, was a Panamanian entity that was beneficially owned and controlled by PetroEcuador Official 1. Shell Company 2 held bank accounts in Panama.

9. "PetroEcuador Official 2," an individual whose identity is known to the United States, was an Ecuadorian citizen who served as PetroEcuador's Shared Service Consultant for Refinery Management. PetroEcuador Official 2 was a foreign official as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

10. "PetroEcuador Official 3," an individual whose identity is known to the United States, was an Ecuadorian citizen who served as the Contracting Manager for PetroEcuador from at least in or about and between 2012 and 2013. PetroEcuador Official 3 was a foreign official as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

11. "PetroEcuador Official 4," an individual whose identity is known to the United States, was the General Manager of the Refinery Division of PetroEcuador who later became Ecuador's Minister of Hydrocarbons. PetroEcuador Official 4 was a foreign official as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-3(f)(2)(A).

12. "Intermediary Company," an entity the identity of which is known to the United States, was a Miami, Florida-based import/export entity. Intermediary Company was a

"domestic concern" as that term is defined in the FCPA, Title 15, United States Code, Section 78dd-2(h)(1). Intermediary Company held a bank account at Citibank in the United States.

## THE FOREIGN CORRUPT PRACTICES ACT

13. The FCPA was enacted by Congress for the purpose of, among other things, making it unlawful to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value, directly or indirectly, to a foreign official for the purpose of assisting in obtaining or retaining business for, or directing business to, any person.

## THE BRIBERY AND MONEY LAUNDERING SCHEME

14. From at least in or about and between January 2013 and 2017, the defendant RAMIRO LUQUE, together with his co-conspirators, engaged in an international bribery and money laundering scheme, in which he knowingly, willfully and corruptly provided millions of dollars to, and for the benefit of, foreign officials in Ecuador, in order to obtain and retain business for and on behalf of LUQUE and companies associated with him.

15. In furtherance of the bribery scheme, the defendant RAMIRO LUQUE and his co-conspirators agreed to pay and paid at least $3,270,980 in bribes to PetroEcuador Officials 1, 2, 3 and 4, among others, from approximately January 2013 to August 2015, for the purpose of obtaining and retaining contracts from PetroEcuador for the removal of hazardous waste and receiving payments pursuant to those contracts.

16. The defendant RAMIRO LUQUE made these payments with the assistance of CC-1, who agreed to assist LUQUE in making the bribe payments in exchange for a fee. To effectuate the bribe payments and to launder the proceeds of the contracts retained through bribery, CC-1 provided access to an offshore bank account of Escrow Agent Company and devised a complicated loan structure to conceal the true nature of the scheme.

17.  To promote the bribery scheme, the defendant RAMIRO LUQUE and his co-conspirators wired approximately $1,670,080 of the bribes from bank accounts in the Cayman Islands and Panama to one or more bank accounts in the United States for the benefit of the PetroEcuador officials.

18.  To conceal the nature of the proceeds that were derived from the bribery scheme, the defendant RAMIRO LUQUE and his co-conspirators instructed PetroEcuador to make the contract payments into various offshore accounts—including the Cayman Islands Account for Escrow Agent Company, a Panamanian bank account for Shell Company 1, and a bank account in Curacao.  LUQUE and his co-conspirators then sent bribe payments from those offshore accounts to other intermediary and shell companies for the benefit of the PetroEcuador officials.

19.  The defendant RAMIRO LUQUE and CC-1 took acts in furtherance of the bribery scheme while in the territory of the United States.  For example, in or about November 2014, LUQUE and CC-1 met at a restaurant in Miami, Florida, where they discussed the prior bribe payments that had been made to the Ecuadorian officials and possible future bribe payments that would be made based on additional contracts that LUQUE expected to receive from PetroEcuador.

20.  As a result of the bribery scheme described herein, in or about and between January 2013 and 2016, Oil Services Company was able to retain and continue to obtain contracts worth approximately $38.8 million with PetroEcuador.  PetroEcuador paid Oil Services Company approximately $27.8 million pursuant to those contracts.

## THE CONSPIRACY

21. The allegations contained in paragraphs one through 20 are realleged and incorporated as if fully set forth herein.

22. In or about and between 2013 and 2017, both dates being approximate and inclusive, within the Southern District of Florida, the defendant RAMIRO ANDRES LUQUE FLORES, also known as "Ramiro Luque," together with others, did knowingly and willfully conspire to commit one or more offenses against the United States, to wit:

(a) to knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit: felony violations of the FCPA, Title 15, United States Code, Section 78dd-3, contrary to Title 18, United States Code, Section 1956(a)(2)(A).

(b) to knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer, monetary instruments and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, knowing that the monetary instruments and funds involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity, and knowing that such transportation, transmission, and transfer was designed in whole or in part to conceal or disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity, to wit: felony violations of the FCPA, Title 15, United States Code, Section 78dd-3, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i).

(c) while in the territory of the United States, to willfully and corruptly make use of the mails and a means and instrumentality of interstate commerce and to do any other act in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to a foreign official, and to a person, while knowing that all or a portion of such money and thing of value would be and had been offered, given, and promised to a foreign official, for purposes of (i) influencing acts and decisions of such foreign official in his official capacity; (ii) inducing such foreign official to do and omit to do acts in violation of the lawful duty of such official; (iii) securing any improper advantage; and (iv) inducing such foreign official to use his influence with a foreign government and agencies and instrumentalities thereof to affect and influence acts and decisions of such government and agencies and instrumentalities, in order to assist LUQUE and others in obtaining and retaining business for and with Oil Services Company and others, contrary to Title 15, United States Code, Section 78dd-3.

23. In furtherance of the conspiracy and to effect the objects thereof, the defendant RAMIRO LUQUE, together with others, committed and caused to be committed, among others, the following:

## OVERT ACTS

(a) On or about February 17, 2013, LUQUE sent an email to PetroEcuador Official 1, stating in Spanish, translated herein in relevant part, that he was planning to send, on February 22, 2013, $700,000 to Intermediary Company's account in the United States and $450,000 to Shell Company 2's account in Panama. The email also stated that a second transfer would be sent to each account on March 7, 2013, in the amounts of $250,000 and $211,000, respectively.

  (b) On or about February 27, 2013, CC-1 caused $700,000 to be wired from Escrow Agent Company's Cayman Islands Account to Intermediary Company's account in the United States.

  (c) On or about June 24, 2013, LUQUE transferred $95,250.44 from Shell Company 1's account in the United States to a bank account in Ecuador in the name of a shell company controlled by CC-1 for the benefit of CC-1 for his assistance in the bribery and money laundering scheme.

  (d) On or about May 8, 2014, LUQUE caused $620,080 to be wired from Shell Company 1's account at Capital Bank in Panama to a U.S. trust account of a law firm in Florida (the "IOLTA account") for the ultimate benefit of PetroEcuador Official 4.

  (e) In or about November 2014, LUQUE and CC-1 met at a restaurant in Miami, Florida, where they discussed the bribe payments that had been made to the PetroEcuador officials and possible future bribes payments that would be made based on additional contracts that LUQUE expected to receive from PetroEcuador.

  (f) On or about January 13, 2015, LUQUE caused $349,950 to be wired from Shell Company 1's account in Panama to Shell Company 2's account in Panama for the benefit of PetroEcuador officials.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION

  24. The United States hereby gives notice to the defendant that, upon his conviction of the offense charged herein, the government will seek forfeiture in accordance with: (a) Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property, real or

personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of such offense; and (b) Title 18, United States Code, Section 982(a)(1), which requires any person convicted of such offense to forfeit any property, real or personal, involved in such offense, or any property traceable to such property.

25. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    (a) cannot be located upon the exercise of due diligence;

    (b) has been transferred or sold to, or deposited with, a third party;

    (c) has been placed beyond the jurisdiction of the court;

    (d) has been substantially diminished in value; or

    (e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), to seek forfeiture of any other

10

property of the defendant up to the value of the forfeitable property described in the forfeiture allegation.

(Title 18, United States Code, Sections 981(a)(1)(C), 982(a)(1) and 982(b)(1); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))


_____
BRIDGET M. ROHDE
Acting United States Attorney
Eastern District of New York


_____
DEBORAH L. CONNOR
Acting Chief, Money Laundering & Asset
Recovery Section
Criminal Division, Department of Justice


_____
SANDRA L. MOSER
Acting Chief, Fraud Section
Criminal Division, Department of Justice